PER CURIAM.
 

 Jason Dirk Walton appeals an order of the Circuit Court of the Sixth Judicial Circuit summarily denying his successive motion to vacate three convictions of first-degree murder and corresponding death sentences under Florida Rule of Criminal Procedure 3.851. Under our mandatory jurisdiction to review orders arising from capital proceedings, we affirm the circuit court’s order.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 In his first claim, Walton has failed to demonstrate that the State violated his constitutional rights by utilizing inconsistent theories to secure convictions against each of the criminal defendants in this triple homicide. Walton also has not established prejudice from the alleged use of a state agent, who did not testify in his second sentencing proceeding. Next, the trial court properly denied Walton’s motion for additional public records because each request was either overbroad, collateral, or irrelevant to his postconviction claims. Lastly, this Court has previously considered and repeatedly rejected the evidence presented by Walton in support of his challenge to the constitutionality of Florida’s lethal injection protocol. Thus, for the reasons explained below, we affirm the circuit court’s order summarily denying postconviction relief.
 

 I. PROCEEDINGS TO DATE
 

 A. Conviction and Sentencing
 

 In 1984, Jason Dirk (J.D.) Walton was convicted of three counts of first-degree murder in Pinellas County.
 
 See Walton v. State,
 
 481 So.2d 1197, 1198-99 (Fla.1985)
 
 (Walton I).
 

 [1]
 

 Armed with guns on a rainy Friday night, Walton, Richard Cooper, Jeffrey McCoy, and Terry Van Royal entered
 
 *1003
 
 Steven Fridella’s residence with the plan to rob the victim of money and drugs.
 
 See
 
 481 So.2d at 1198;
 
 Walton v. State,
 
 547 So.2d 622, 623 (Fla.1989)
 
 ('Walton II).
 
 Once inside the house, they bound and held at gunpoint Fridella and two other men, Gary Peterson and Bobby Martin-dale. Walton ransacked the house but did not find any money or drugs. With the original plan proving unsuccessful, the three victims were killed by several shotgun blasts.
 
 See Walton I,
 
 481 So.2d at 1198.
 

 Walton made two statements to the police in which he admitted being present at the time of the homicide but denied any part in the shootings.
 
 See id.
 
 He told police that although he initiated the idea to commit the intended crime, he tested his handgun before entering the house and it had misfired.
 
 See id.
 
 He observed Van Royal and Cooper pointing shotguns at the victims. As Walton exited the house, he heard several gunshots.
 
 See id.
 

 The jury found Walton guilty of all three counts of first-degree murder.
 
 See id.
 
 During the first penalty phase, the State introduced the testimony of an alleged jailhouse informant and former cellmate of codefendant Cooper.
 
 See id.
 
 at 1198-99. The cellmate testified that Cooper had indicated Walton was the “ringleader” and had informed Cooper that the codefen-dants were going to “eliminate” the victims.
 
 Id.
 
 The State also introduced the written confessions of Cooper and McCoy.
 
 See id.
 
 at 1198. Following the jury recommendation, the trial court imposed a death sentence for each murder. On direct appeal, this Court affirmed the convictions but reversed the death sentences and remanded for a new sentencing hearing because the written confessions constituted hearsay and thus were admitted in violation of Walton’s confrontation rights. See
 
 id.
 
 at 1200-01.
 

 During the second sentencing hearing, the State did not introduce the written confessions or the testimony of the jailhouse informant. Instead, it again presented Walton’s confession, including the statement that Walton “turned on the television full blast to prevent the neighbors from hearing the victims scream and that he heard shotgun blasts as he left.”
 
 Walton II,
 
 547 So.2d at 623. A taped statement by McCoy was presented to the jury, which described the four men carefully devising the plan as retaliation because one of the victims had stolen marijuana from Walton’s trailer.
 
 See id.
 
 A majority of the jury recommended death sentences on all counts, which the trial court imposed and this Court affirmed.
 
 See Walton II,
 
 547 So.2d at 623.
 

 B. Rule 3.850 and Habeas Proceedings
 

 Governor Martinez signed a death warrant for Walton on September 24, 1990, and denied Walton’s request for clemency. Thereafter, this Court granted a stay of execution for Walton to file his first rule 3.850 motion to vacate his convictions and sentences. The trial court denied Walton’s ensuing motion.
 
 [2]
 
 In the same
 
 *1004
 
 year, Walton filed a petition for writ of habeas corpus in this Court, in which he claimed error in the penalty phase jury instructions and presented other claims that were also concurrently presented in his motion to vacate.
 
 [3]
 
 On appeal of the order denying the rule 3.850 motion, Walton contended that the circuit court erred when it denied his claim that the prosecutor had utilized inconsistent theories in securing the death sentences against him, which violated his rights under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and
 
 Giglio v. United States,
 
 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Of note, Walton has also raised this claim in the motion presently under review. This Court relinquished jurisdiction, reversed for an evidentiary hearing regarding Walton’s entitlement to various public records, and reserved ruling on the other claims pending disposition of the public records request.
 
 See Walton III,
 
 634 So.2d at 1062.
 

 Subsequently, Walton filed his Third Amended Motion to Vacate based on newly discovered evidence found during the public records litigation. In this motion, it appears that Walton retooled his inconsistent theories claim as an ineffective assistance of counsel claim. The circuit court denied the motion after an evidentiary hearing. On appeal, Walton raised several additional claims.
 
 [4]
 
 This Court affirmed the order and denied the habeas petition.
 
 See Walton IV,
 
 847 So.2d at 443-60.
 

 C. Successive Postconviction Proceedings
 

 In 2006, Walton filed a successive motion for postconviction relief based on the discussion of inconsistent prosecutorial theories in
 
 Bradshaw v. Stumpf,
 
 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), and newly discovered affidavits from two witnesses regarding the jail informant’s alleged role as a state agent. Walton also claimed that Florida’s lethal injection protocol violates the Eighth Amendment based on the newly discovered evidence presented within an article,
 
 Inadequate Anaesthesia in Lethal Injection for Execution,
 
 published in
 
 The Lancet,
 

 [5]
 

 and the American Bar Association’s report on the death penalty,
 
 Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report,
 
 issued in 2006. In conjunction with his motion, Walton filed demands for public records from the Department of Corrections, the Office of the Attorney General, and the Office of the State Attorney, which were met with objections from each entity. The circuit court denied the public records request and entered a separate order summarily denying the motion to vacate. Walton now seeks relief from this Court, raising four
 
 *1005
 
 issues related to the motion to vacate and two issues relating to the motion for production of additional public records.
 

 II. ANALYSIS.
 

 A. The State Did Not Use Inconsistent Theories to Secure Death Sentences Against All Codefendants.
 

 In
 
 Bradshaw v. Stumpf,
 
 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), the United States Supreme Court addressed a prosecutor’s use of inconsistent theories. Walton asserts that
 
 Bradshaw
 
 recognized a new constitutional right, which was that the State violates due process if it advances inconsistent positions to secure the same sentence against codefendants. Drawing from this “newly recognized” right, Walton now alleges that the State’s presentation of inconsistent theories in the codefendants’ cases violated his due process rights. Walton asserts that the State contended during his criminal proceedings that he was the ringleader and he ordered the codefendants to shoot the victims. Walton then posits, in supposed contrast, that the State argued in the separate trials of his codefendants (Cooper and Van Royal) that they shot the victims of their own will and thus were not entitled to mitigation for acting under extreme duress or substantial domination by Walton at the time of the murders. Walton maintains that these alleged inconsistencies subjected him to irreparable prejudice because the State’s prosecutorial theory and the trial court’s decision focused on his ringleader role as the basis for imposing the death sentences.
 

 A successive rule 3.851 motion may be denied without an evidentiary hearing if the records of the case conclusively show that the movant is entitled to no relief.
 
 See
 
 Fla. R.Crim. P. 3.851(f)(5)(B). This Court reviews the circuit court’s decision to summarily deny a successive rule 3.851 motion de novo, accepting the movant’s factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief.
 
 See State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003); Fla. R.Crim. P. 3.851(f)(5)(B).
 

 The record conclusively demonstrates that Walton is not entitled to relief because this claim is procedurally barred and meritless. Florida Rule of Criminal Procedure 3.851(d)(2)(B) requires any motion to vacate judgment of conviction and death sentence to be filed within one year after the judgment and sentence become final unless the motion alleges that a fundamental constitutional right, held to apply retroactively, was established after that period. Thus, as the circuit court determined, Walton’s claim is procedurally barred because the
 
 Bradshaw
 
 Court did not recognize a new fundamental constitutional right that applies retroactively.
 
 See Van Poyck v. State,
 
 961 So.2d 220, 227 (Fla.2007);
 
 Raleigh v. State,
 
 932 So.2d 1054, 1065-67 (Fla.2006);
 
 see also Fotopoulos v. Sec’y, Dep’t of Corr.,
 
 516 F.3d 1229, 1235 (11th Cir.2008) (“[T]he
 
 Bradshaw
 
 Court did not hold that the use of inconsistent theories in the prosecution of two defendants violates the right to due process.”)
 

 Rather, the United States Supreme Court specifically declined to rule on the question of whether the prosecutor’s use of inconsistent theories constituted a due process violation.
 
 See Bradshaw,
 
 545 U.S. at 186-89, 125 S.Ct. 2398. After concluding that the court of appeals had erroneously held that the prosecutorial inconsistencies voided the defendant/appellee’s guilty plea, the United States Supreme Court “expressed] no opinion on whether the prosecutor’s actions amounted to a due process violation, or whether any such violation
 
 *1006
 
 would have been prejudicial.”
 
 Id.
 
 at 187, 125 S.Ct. 2398.
 

 Additionally, Walton concedes that he had previously raised versions of this claim in his initial and third motions to vacate, belying any assertion that this is a newly discovered error.
 
 See Walton IV,
 
 847 So.2d at 456;
 
 Walton III,
 
 634 So.2d at 1061 n.1. In fact, this Court has already applied the reasoning of
 
 Fotopoulos v. State,
 
 838 So.2d 1122, 1137 (Fla.2002), to determine that Walton’s trial counsel was not ineffective for failing to rebut the State’s ringleader argument with the prosecutor’s statements in Cooper’s trial that it was “absolutely ludicrous” to fault Walton for Cooper’s actions, and that no evidence supported the “incredible proposition” that Walton dominated Cooper during the crime.
 
 See Walton IV,
 
 847 So.2d at 456. We held that Walton was unable to show prejudice on his ineffective assistance of counsel claim because the
 

 [ejvidence introduced at Walton’s trial showed that Walton originated the plan to rob the victims on a rainy night, Walton armed the group prior to the [episode], and Walton was the only defendant involved who knew the location of the victims’ house. In the face of this overwhelming evidence, it is clear that the introduction of two statements by a state attorney in a codefendant’s trial would not have been overly persuasive. Certainly, non-introduction of this evidence does not undermine our confidence in the outcome.
 

 Id.
 
 (citation omitted). Thus, this Court has already determined that the alleged inconsistent statements are neither persuasive nor do they undermine our confidence in Walton’s convictions and sentences. This claim is therefore procedurally barred because Walton has failed to demonstrate a basis for escaping the one-year time limitation on raising the issue.
 

 Even if this claim did not face a procedural bar, it would still fail because the State advanced a wholly consistent theory of the crime in prosecuting the codefendants. The prosecutorial theory that Walton was the ringleader and that Cooper and Van Royal were the primary shooters is neither a differing nor an irreconcilable rendition of the factual scenario. In contrast, the State in
 
 Fotopoulos
 
 clearly advanced inconsistent positions, asserting in codefendant Deidre Hunt’s case that she was an independent actor voluntarily participating in the murders, yet presenting the central theory in Fotopoulus’s trial that Hunt was dominated by Fotopoulos.
 
 See Fotopoulos,
 
 838 So.2d at 1128;
 
 see also Bradshaw,
 
 545 U.S. at 186-89, 125 S.Ct. 2398 (where the state advanced the theory that the defendant was the primary shooter but asserted in the eodefendant’s hearing that the eodefendant was the primary shooter). Unlike the irreconcilably contrasting theories in
 
 Fotopoulos
 
 and
 
 Bradshaw,
 
 which each court upheld as permissible, the State here did not alter its theory with regard to the identity of the principal shooters.
 

 In
 
 Raleigh v. State,
 
 932 So.2d 1054 (Fla.2006), this Court analyzed a similar claim where the appellant challenged the State’s theory of the principal actor’s identity in a double murder. There the prosecutor asserted that the appellant was the principal actor in the murder of both victims. However, during closing argument in the code-fendant’s trial, the prosecutor noted the eodefendant had admitted that he killed one of the victims and that the appellant killed the other victim. This Court determined that the due process concerns in
 
 Bradshaw
 
 were not present because the State had consistently asserted in both trials that Raleigh was a principal actor in the death of one victim and that the statements of the codefendant merely reflected that the codefendant played a greater role
 
 *1007
 
 in the murder than he initially admitted. “The essence of this argument was that [the codefendant] was no less culpable for the murder of [the victim] than Raleigh.”
 
 Raleigh,
 
 932 So.2d at 1066. Similarly, the prosecutor’s argument that Walton was the ringleader and that Cooper and Van Royal were the shooters was directed to the culpability of each defendant. In asserting that Cooper was not under the control and substantial domination of Walton when he shot the victims, the prosecutor sought to establish that Cooper was no less culpable than Walton, who orchestrated the plan that culminated in the triple homicide, and thus Cooper was not entitled to mitigation for allegedly acting under duress.
 

 A comparison of the challenged statements in Cooper’s sentencing hearing with those at Walton’s hearing confirms the cohesion of the State’s theory. At Cooper’s hearing, the State said that Cooper
 

 was ready, posed and willing with his finger on the trigger and he made the decision to pull that trigger and to cock it and to pull the trigger again, and aimed it at a second victim and to cock it again and pull the trigger again and aim it at a third victim and then to reload either the last shot or the fourth shot and to come back in the house and pull the trigger again and then cock it again and eject the shell inside the house.
 

 In Walton’s hearing, the State argued: “J.D. took the handgun, typically
 
 he had other peaple do the dirty work,
 
 but unquestionably,
 
 he ivas the ringleader,
 
 he was the planner, he was the prime mover among these younger individuals.” (Emphasis supplied.) In direct comparison, these statements show the underlying principle and theme that Walton was the ringleader and that Cooper ultimately pulled the trigger.
 

 As an aside, Walton has claimed that this scenario was a “total fiction.” However, Walton’s own confession, along with the other facts presented during the sentencing hearing, corroborates the State’s theory that Walton organized the criminal episode. Therefore, the State did not take an inconsistent position or “change course” in its theory.
 
 Raleigh,
 
 932 So.2d at 1067. In each proceeding resulting from the triple homicide, the State maintained the position that Walton was the ringleader and that Cooper and Van Royal were the trigger-men. The State did not advance inconsistent theories implicating Walton’s due process rights. Thus, we affirm the circuit court’s summary denial of this claim because Walton has failed to demonstrate either a new and fundamental change in constitutional law or that the State used inconsistent theories to secure the death penalty against Walton and his codefen-dants.
 

 B. Any Possible Error in the Alleged Failure to Disclose the Use of a State Agent in the Sentencing Hearing that Resulted in the Death Sentence That Was Later Vacated Did Not Prejudice Walton.
 

 Walton next contends that the State withheld material and exculpatory evidence tending to prove that a witness— who did not testify during either the guilt phase of the trial or the resentencing hearing — was a state agent, in violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and
 
 Giglio v. United States,
 
 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). He claims that three affidavits filed in the federal proceeding's of codefendant Cooper constitute newly discovered evidence supporting this claim. Despite the fact that the witness did not testify during the second penalty proceeding, Walton asserts that the State’s failure to disclose the informant’s status as a state agent prejudiced him because the resentencing order referenced the informant’s prior testimony. We re
 
 *1008
 
 view de novo the application of the law while giving deference to the trial court on questions of fact.
 
 See Way v. State,
 
 760 So.2d 903, 913 (Fla.2000). Under this review, it is clear that Walton is not entitled to relief on this claim because he has failed to demonstrate any prejudice from the alleged errors.
 

 i. Newly Discovered Evidence Claim
 

 Walton contends that these affidavits constitute newly discovered evidence that the State utilized a state agent to secure incriminating evidence against him and that they lend further support to his
 
 Brady
 
 and
 
 Giglio
 
 claims. To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of due diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
 
 See Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998). Newly discovered evidence satisfies the second prong of this test if it “weakens the ease against [the defendant] so as to give rise to a reasonable doubt as to his culpability.”
 
 Id.
 
 at 526 (quoting
 
 Jones v. State,
 
 678 So.2d 309, 315 (Fla.1996)).
 

 Under this second prong, Walton has failed to demonstrate that these affidavits constitute evidence of such a nature that it would probably produce an acquittal on retrial. To the extent the affidavits suggest that the informant may have assisted as a state agent, they do not outweigh the strong evidence of Walton’s role in the triple homicide, which this Court has affirmed.
 
 See Walton I,
 
 481 So.2d at 1200. At most, the affidavits suggest that the jailhouse informant told some police officers that he was assisting the State and that he was housed in the section of the jail that included informants. These general allegations, which do not specifically link the informant’s comments to Walton’s case or even the witness to the resentenc-ing proceeding, cannot supersede the plethora of evidence supporting Walton’s convictions and sentences.
 

 Even though the informant was not presented as a witness during either the guilt phase of the trial or the resentencing hearing, Walton further asserts that the informant’s testimony nevertheless “contaminated” the resentencing hearing because the resentencing court included small details about the commission of the crime, such as Walton grabbing the victim’s hair, that were presented only in the informant’s prior testimony. Within the context of an ineffective assistance of counsel claim in Walton’s prior appeal, however, this Court rejected the “contamination” argument:
 

 Walton seizes upon the trial court’s determination in its order that “Walton grabbed one of the victims by the hair,” in an attempt to show that the entire resentencing was tainted with evidence from the previous penalty phase reversed in
 
 Walton I.
 
 The State cannot identify any source for this information, and there is seemingly no record material from the resentencing proceedings which supports this statement by the trial court. While this presents questions, the inclusion of one errant phrase by the trial court in its sentencing order is not significant evidence that the trial court relied upon the original confessions of McCoy and Cooper [and, thus, the testimony of the informant who corroborated these confessions] in sentencing Walton to death. Clearly, taken in conjunction with the presence of
 
 overwhelming evidence
 
 before the court
 
 supporting its conclusions
 
 as to Walton’s leadership role in the burglary planning, this mistaken statement by the trial
 
 *1009
 
 court within its final order was
 
 harmless.
 
 Certainly, the trial court’s final sentencing decision did not hinge upon whether Walton actually placed his hands upon a victim’s hair or not. Thus,
 
 this error did not contribute to Walton’s sentence,
 
 and we conclude that it was harmless under
 
 State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986).
 

 Walton IV,
 
 847 So.2d at 448 (footnote omitted) (emphasis supplied). Thus, Walton has failed to establish that these affidavits constitute newly discovered evidence that would probably produce a different outcome.
 

 ii.
 
 Brady
 
 Claim
 

 Furthermore, these affidavits do not establish Walton’s claim of a
 
 Brady
 
 violation. Nothing in the record regarding the alleged informant’s speculative use as a state agent undermines our confidence in the verdict or sentences rendered to meet the materiality prong of
 
 Brady.
 
 The State is required, under
 
 Brady,
 
 to disclose material information within its possession or control that is favorable to the defense.
 
 See Mordenti v. State,
 
 894 So.2d 161, 168 (Fla.2004). To establish a
 
 Brady
 
 violation, the defendant has the burden to show (1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Under
 
 Strickler,
 
 the materiality prong of
 
 Brady
 
 requires that the defendant demonstrate that there is a reasonable probability of a different outcome expressed as a probability sufficient to undermine our confidence in the outcome.
 
 See id.
 
 Even if we were to assume that the State erroneously withheld information, Walton suffered no prejudice because the informant did not testify during either the guilt phase of the trial or during the resentencing hearing. Any possible impeachment of the informant that was not established due to the claim that the State withheld his state agent status cannot be deemed material because there was no witness to impeach with the use of the alleged state agent in either the guilt phase of the trial, which resulted in Walton’s judgment of conviction, or during the resentencing hearing that determined his sentence. Thus, there is no reasonable probability that the nondisclosure of the informant’s status would result in a different outcome such as to undermine our confidence in the verdicts or sentences under
 
 Brady
 
 and
 
 Strickler.
 

 iii.
 
 Giglio
 
 Claim
 

 Moreover, the State did not present any testimony from the alleged informant during the guilt phase of the trial or the resentencing hearing, which leaves no reasonable possibility that the use of this testimony could have affected the outcome pursuant to
 
 Giglio.
 
 To establish a
 
 Giglio
 
 violation, it must be shown that: “(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material.”
 
 Guzman v. State,
 
 868 So.2d 498, 505 (Fla.2003). This test requires us to consider whether there is any reasonable possibility that the false evidence could have affected the jury’s verdict or sentencing recommendation.
 
 See Guzman v. State,
 
 941 So.2d 1045, 1050 (Fla.2006). If the State actually presented misleading testimony at the first sentencing hearing, Walton still did not suffer any prejudice because the informant did not testify before a jury during the phases of the criminal proceeding that resulted in his judgment of conviction and death sentence. The only hearing during which false testimony from the informant could have been presented was the hearing that resulted in the death sentence that this Court later vacated. Thus, Walton has failed to establish a reasonable possibility that this al
 
 *1010
 
 leged error could have affected the jury’s verdict or any sentence under
 
 Giglio.
 

 We affirm the circuit court’s summary denial of this claim because the purported newly discovered evidence of a
 
 Brady
 
 or
 
 Giglio
 
 violation lacks any reasonable probability to undermine our confidence under
 
 Brady
 
 or any reasonable possibility that it could have affected the jury’s verdict or recommendation of a death sentence under
 
 Giglio.
 
 Furthermore, the affidavits do not constitute newly discovered evidence of such a nature that it would probably produce an acquittal on retrial. Therefore, this claim must also be denied.
 

 iv. Public Records Request
 

 In conjunction with this claim, Walton sought additional public records from the Office of the State Attorney. Walton requested all records, files, documents, notes, pleadings, memoranda, and attorney work product relating to eodefendant Cooper’s postconviction proceedings. He also desired access to all records, files, documents, notes, pleadings, memoranda, statements, and transcripts relating to the jailhouse informant where he was either a party or a witness. The circuit court denied the motion for the informant’s records because they were previously requested by defense counsel in 1993 and 1995 and determined to be statutorily exempt from production. With regard to Cooper’s documents, the circuit court found no indication that the information in a collateral, unrelated proceeding had any bearing on Walton’s current motion or that the records were relevant or reasonably calculated to lead to the discovery of admissible evidence in Walton’s postconviction proceeding.
 

 This Court reviews the trial court’s denial of a public records request for abuse of discretion.
 
 See Diaz v. State,
 
 945 So.2d 1136, 1149 (Fla.2006). Florida Rule of Criminal Procedure 3.852(i)(2), which limits postproduction requests for additional records, requires production of public records upon a finding of the following:
 

 (A) collateral counsel has made a timely and diligent search of the records repository;
 

 (B) collateral counsel’s affidavit identifies with specificity those additional public records that are not at the records repository;
 

 (C) the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence; and
 

 (D) the additional records request is not overly broad or unduly burdensome.
 

 A review of Walton’s February 13, 2006, demand reveals that competent, substantial evidence supported the trial court’s exercise of discretion to deny the requests.
 

 After an
 
 in-camera
 
 review by the circuit court in 1995, it was determined that the jailhouse informant’s files were statutorily exempt from production under chapter 119, Florida Statutes (1995).
 
 See also
 
 Fla. R.Crim. P. 3.852(0(1) (limiting the scope of production to records that are not privileged or immune from production). Even without these exemptions, Walton’s demand does not demonstrate how the documents would be reasonably calculated to lead to relevant information because the informant, as repeatedly noted,
 
 did not
 
 testify during Walton’s second sentencing proceeding. Walton also has not shown any change in circumstance from the circuit court’s 1995 ruling.
 

 Lastly, Walton’s demand appears to be an “overly broad or unduly burdensome” fishing expedition seeking any and all records from more than thirty irrelevant, collateral cases unrelated to Walton’s post-conviction claim.
 
 See
 
 Fla. R.Crim. P. 3.852(i)(2)(D). To delve so deeply into collateral matters, Walton must explain, at a
 
 *1011
 
 minimum, how that information would lead to evidence related to Walton’s claim.
 
 See
 
 Fla. R.Crim. P. 3.852(i)(1)(C), (2)(D). Walton did not demonstrate that discovery of the codefendant’s postconviction documents, the boxes of material relating to the informant in the federal court order, the case files in which the informant was a defendant, and the cases where, “based on the best information that was available, counsel
 
 believed
 
 ” that the informant was a state witness, would reasonably lead to evidence that would support his postcon-viction claim. The informant did not testify during Walton’s resentencing hearing, and this Court does not deem any evidence corroborating the informant’s purported status as a state agent to be material to the sentences imposed on remand. Likewise, the codefendant’s
 
 Brady
 
 claim in federal court has no bearing on Walton’s present motion. We therefore affirm the circuit court’s order denying the demand for production because the record supports its appropriate exercise of discretion.
 

 C. Lethal Injection Claims.
 

 i.
 
 The Lancet
 
 Article and Diaz Execution
 

 Next, Walton challenges the constitutionality of Florida’s lethal injection protocol under the Eighth Amendment of the United States Constitution. The issue presented to the trial court in Walton’s postconviction motion was whether the study published in
 
 The Lancet, Inadequate Anaesthesia in Lethal Injectiim for Execution,
 
 constituted newly discovered evidence.
 
 See
 
 Leonidas G. Koniaris et al.,
 
 Inadequate Anestltesia in Lethal Injection for Execution,
 
 365 Lancet 1412 (2005). In summarily denying this claim, the circuit court ruled that it was bound by our decisions in
 
 Diaz v. State,
 
 945 So.2d 1136 (Fla.2006),
 
 Rolling v. State,
 
 944 So.2d 176, 179 (Fla.2006),
 
 Rutherford v. State,
 
 926 So.2d 1100, 1113 (Fla.2006), and
 
 Hill v. State,
 
 921 So.2d 579, 583 (Fla.2006), which held that (1)
 
 the Lancet
 
 study does not constitute newly discovered evidence; and (2) execution by lethal injection does not constitute cruel and unusual punishment.
 

 On appeal, Walton appears to withdraw from any reliance upon
 
 The Lancet
 
 study. Instead, Walton now asserts that the circuit court erred in prematurely denying his successive motion before he had the opportunity to file a motion to amend his claim, which he did not intend to file until after the issues surrounding the Diaz execution were resolved. Reviewing the time-line of events, the Diaz execution occurred in early December 2006. In response, Walton moved to continue the case management conference scheduled for late December 2006. The circuit court granted this motion and rescheduled the conference for mid-January 2007. In February 2007, this Court dismissed without prejudice Walton’s petition in
 
 Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007), which would not have prevented him from filing a postconviction motion in the appropriate circuit court.
 
 [6]
 
 The Governor’s Commission on the Administration of Lethal Injection in Florida issued its report regarding the Diaz execution in March 2007.
 

 Thus, from December 2006, at the earliest, and by March 2007, at the latest, Walton was on notice to amend his motion to include any claims regarding the Diaz execution. Walton did not, however, attempt to supplement his motion based on
 
 *1012
 
 the Diaz execution and the subsequent remedial measures. In his motion for rehearing, filed in late-March 2007, Walton’s counsel sought for the first time leave to amend his lethal injection claim based on newly discovered evidence premised upon the events surrounding the Diaz execution. In essence, Walton now contends that the trial court erred by not holding the disposition of his successive postconviction motion in abeyance until some unknown time when he was ready to file an amendment to his lethal injection claim.
 

 We review the denial of a motion to amend a postconviction motion for abuse of discretion.
 
 See Huff v. State,
 
 762 So.2d 476, 481 (Fla.2000). A review of the rules of procedure does not support Walton’s contention that a circuit court should perpetually hold resolution of a motion in abeyance pending an unfiled amendment to the motion. Moreover, Walton had several months between the Diaz execution and the circuit court’s order denying his motion to submit any amendments. Despite this window of opportunity, Walton did not timely file an amended motion, nor did he request leave to supplement the motion.
 
 Cf. Gaskin v. State,
 
 737 So.2d 509, 518 (Fla.1999) (holding that the circuit court erred in failing to consider the merits of new allegations in a timely filed amended postconviction motion),
 
 receded from on other grounds by Nelson v. State,
 
 875 So.2d 579, 583 (Fla.2004). Thus, the trial court did not abuse its discretion by failing to consider amendments and allegations that were never filed or raised until the motion for rehearing.
 

 Furthermore, even if we considered the merits, this Court has continually upheld the constitutionality of Florida’s lethal injection protocol since the issuance of
 
 Lightbourne. See Tompkins v. State,
 
 994 So.2d 1072, 1082-83 (Fla.2008) (citing
 
 Power v. State,
 
 992 So.2d 218, 220-21 (Fla.2008);
 
 Sexton v. State,
 
 997 So.2d 1073, 1089 (Fla.2008);
 
 Henyard v. State,
 
 992 So.2d 120, 129 (Fla.2008),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 28, 171 L.Ed.2d 930 (2008);
 
 Schwab v. State,
 
 995 So.2d 922, 925-33 (Fla.2008),
 
 petition for cert filed,
 
 No. 08-5020 (U.S. June 30, 2008);
 
 Woodel v. State,
 
 985 So.2d 524, 533-34 (Fla.2008),
 
 cert. denied,
 
 — U.S.-, 129 S.Ct. 607, 172 L.Ed.2d 465 (2008);
 
 Lebron v. State,
 
 982 So.2d 649, 666 (Fla.2008);
 
 Schwab v. State,
 
 982 So.2d 1158, 1159-60 (Fla.2008);
 
 Lightbourne v. McCollum,
 
 969 So.2d 326, 350-53 (Fla.2007),
 
 cert. denied
 
 — U.S. -, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008);
 
 Schwab v. State,
 
 969 So.2d 318, 321-25 (Fla.2007),
 
 cert. denied,
 
 — U.S. ——, 128 S.Ct. 2486, 171 L.Ed.2d 777 (2008)).
 

 The research study in
 
 The Lancet
 
 does not constitute newly discovered scientific evidence that Florida’s lethal injection protocol creates a substantial, foreseeable, or unnecessary risk of pain for the condemned.
 
 See Rutherford,
 
 926 So.2d at 1113-14;
 
 see also Sims v. State,
 
 754 So.2d 657, 668 (Fla.2000). Walton fails to present any additional testimony or evidence regarding Florida’s current lethal injection protocol other than those already rejected by this Court. Since the issuance of our decision in
 
 Lightboume,
 
 further developments support our conclusion that Florida’s lethal injection protocol does not constitute cruel and unusual punishment under the Eighth Amendment. As to the first development, Walton does not present any new evidence with regard to the chemicals employed since the United States Supreme Court’s decision in
 
 Baze v. Rees,
 
 — U.S. -, -, 128 S.Ct. 1520, 1534, 170 L.Ed.2d 420 (2008), which upheld the constitutionality of the same method of execution used in Florida, consisting of lethal injection through the same three-drug combination under similar protocols.
 

 
 *1013
 
 Moreover, we have rejected contentions that
 
 Baze
 
 set a different or higher standard for lethal injection claims than
 
 Lightbourne. See, e.g., Henyard,
 
 [992 So.2d at 129] (rejecting Henyard’s argument that
 
 Baze
 
 sheds new light on this Court’s decisions because the standard for reviewing Eighth Amendment challenges was changed and noting that “[w]e have previously concluded in
 
 Lightboume
 
 and
 
 Schwab
 
 that the Florida protocols do not violate any of the possible standards, and that holding cannot conflict with the narrow holding in
 
 Baze
 
 ”). The second development was the performance of two executions in Florida, those of Mark Dean Schwab and Richard Henyard, with no subsequent allegations of any newly discovered problems with Florida’s lethal injection process, such as the problems giving rise to the investigations following the Diaz execution.
 

 Tompkins,
 
 994 So.2d at 1081-82. Thus, the circuit court did not err in summarily denying relief on this claim.
 

 ii. The ABA Report
 

 Walton has separately asserted that the ABA report entitled
 
 Evaluating Fairness and Accuracy in the State Death Penalty System: The Floñda Death Penalty Assessment Report,
 
 published September 17, 2006, constitutes newly discovered evidence which reveals that the imposition of the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment. Just as this Court has previously considered
 
 The Lancet
 
 report, we have also reviewed the ABA report and concluded that it does not constitute newly discovered evidence because the report is “a compilation of previously available information related to Florida’s death penalty system and consists of legal analysis and recommendations for reform, many of which are directed to the executive and legislative branches.”
 
 Rutherford v. State,
 
 940 So.2d 1112, 1117 (Fla.2006);
 
 see also Tompkins,
 
 994 So.2d at 1082-88;
 
 Power,
 
 992 So.2d at 220-28;
 
 Schwab,
 
 969 So.2d at 325-26 (“[T]his Court has not recognized ‘new opinions’ or ‘new research studies’ as newly discovered evidence.”);
 
 Diaz,
 
 945 So.2d at 1136;
 
 Rolling,
 
 944 So.2d at 181. Moreover, nothing in the report would cause this Court to recede from its past decisions upholding the facial constitutionality of the death penalty.
 
 See Rolling,
 
 944 So.2d at 181 (citing
 
 Rutherford,
 
 940 So.2d at 1118).
 

 Though Walton attempts to allege that the report’s conclusions render his individual death sentence unconstitutional, the specific allegations in his motion merely refer to generalities that are noted in the report but do not relate in any specific way to Walton’s death sentence.
 
 See Tompkins,
 
 994 So.2d at 1083;
 
 Power,
 
 992 So.2d at 222. Walton also fails to assert that had a hearing been granted, he would have presented additional evidence or testimony regarding the lethal injection protocol that would yield a less severe sentence than those already rejected in
 
 Tompkins, Power, Diaz, Rolling,
 
 and
 
 Rutherford.
 
 Thus, for the same reasons that we expressed in our previous decisions, we again hold that the ABA report does not constitute newly discovered evidence demonstrating the unconstitutionality of Florida’s capital sentencing mechanisms.
 

 iii. Request for Additional Public Records Relating to Lethal Injection
 

 In his motion for production of public records to support his claim that lethal injection constitutes cruel and unusual punishment, Walton sought “all information that in any way related to lethal injection,” specifically enumerating an additional sixty-one documents or categories of documents relating to execution by lethal injection. Walton’s request was made pur
 
 *1014
 
 suant to Florida Rule of Criminal Procedure 3.852(i), which limits postproduction requests for additional records. The record conclusively demonstrates that the circuit court did not abuse its discretion in denying this claim because the records requested were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence for this claim.
 
 See
 
 Fla. R.Crim. P. 3.852(i)(2)(C) (requiring production of records upon finding that the additional records sought are either relevant or reasonably calculated to lead to the discovery of admissible evidence). Foremost, as explained in connection with our discussion of lethal injection, production of these records is unlikely to lead to a color-able claim for relief because the challenge to the constitutionality of lethal injection as currently administered in Florida has been fully considered and rejected by the Court.
 
 See Tompkins,
 
 994 So.2d at 1090;
 
 Power,
 
 992 So.2d at 221-23;
 
 Sexton,
 
 997 So.2d at 1089;
 
 Henyard,
 
 992 So.2d at 129-30;
 
 Schwab,
 
 969 So.2d at 321-26;
 
 Lightbourne,
 
 969 So.2d at 349-53. Walton has not alleged any specific problems with Florida’s lethal injection protocol following the Schwab and Henyard executions that might support a different Eighth Amendment claim than the one previously rejected in
 
 Lightbourne. See Tompkins,
 
 994 So.2d at 1090. Thus, the record contains competent, substantial evidence that supports the circuit court’s decision to deny the request.
 

 Accordingly, for the reasons set out above, we affirm the trial court’s summary denial of Walton’s successive postconviction motion.
 

 It is so ordered.
 

 WELLS, PARIENTE, LEWIS, and CANADY, JJ., and ANSTEAD, Senior Justice, concur.
 

 QUINCE, C.J., recused.
 

 POLSTON, J., did not participate.
 

 [1]
 

 . Further factual details can be found in the Court's previous decisions addressing Walton's capital proceedings.
 
 See Walton v. State,
 
 847 So.2d 438 (Fla.2003)
 
 (Walton IV)
 
 (affirming denial of rule 3.850 motion and petition for writ of habeas corpus);
 
 Walton v.
 
 
 *1003
 

 State,
 
 634 So.2d 1059 (Fla.1993)
 
 (Walton III)
 
 (remanding for further circuit court proceedings on rule 3.850 motion and petition for writ of habeas corpus);
 
 Walton v. State,
 
 547 So.2d 622 (Fla.1989)
 
 (Walton II)
 
 (direct appeal after resentencing);
 
 Walton v. State,
 
 481 So.2d 1197 (Fla.1985)
 
 (Walton I)
 
 (direct appeal reversing and remanding for new sentencing hearing).
 

 [2]
 

 . Walton raised thirteen claims relating to his counsel's alleged ineffectiveness, including challenges to the (1) proportionality of the death sentence and aggravating circumstances; (2) improper jury instructions and their alleged shifting of the burden of proof; (3) contamination of the resentencing proceeding with the evidence this Court determined was improperly presented during his first sentencing proceeding; (4) admission of the testimony of a codefendant's mental
 
 *1004
 
 health expert; (5) suppression of statements; (6) absence of Walton from a portion of the proceedings; and (7) application of Florida Rule of Criminal Procedure 3.851.
 
 See Walton IV,
 
 847 So.2d at 442 n. 1.
 

 [3]
 

 .Walton's habeas petition alleged ten claims, including: (1) new law mandated reconsideration of his original evidentiary claims; (2) unconstitutional procedures in Florida’s system of capital sentencing; (3) errors in proportionality and aggravating circumstances; and (4) prejudicial admission of evidence of collateral crimes.
 
 See Walton IV,
 
 847 So.2d at 443 n. 3.
 

 [4]
 

 . Walton’s appeal added the following claims: (1) counsel failed to adequately investigate and prepare for trial; (2) violation of
 
 Brady;
 
 (3) error in admission of testimony of a code-fendant's mental health expert; and (4) new trial mandated by newly discovered evidence tending to show that Walton was not the ringleader.
 
 See Walton IV,
 
 847 So.2d at 438 n. 2.
 

 [5]
 

 . Leonidas G. Koniaris et al.,
 
 Inadequate Anaesthesia in Lethal Injection for Execution,
 
 365 Lancet 1412 (2005).
 

 [6]
 

 . Walton was among a group of death row inmates who filed an emergency all writs petition in
 
 Lightbourne,
 
 which requested that this Court address whether Florida's lethal injection protocol violates the Eighth Amendment in the wake of the Diaz execution.
 
 See Lightbourne,
 
 969 So.2d at 328-29. Except for petitioner Lightbourne, we dismissed the claims of all the petitioners without prejudice.
 
 See Lightbourne v. McCollum,
 
 No. SC06-2391 (Fla. order dated Feb. 9, 2007).